UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

NEW YORK SKYLINE, INC.,

        **Plaintiff,**

   **- against -**

EMPIRE STATE BUILDING
COMPANY L.L.C., EMPIRE STATE
BUILDING, INC. and EMPIRE STATE
BUILDING ASSOCIATES, L.L.C.,

        **Defendants.**

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/20/15

**OPINION AND ORDER**

**13-cv-7686 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This adversary proceeding between former debtor New York Skyline Inc. ("Skyline"), the operator of a helicopter simulator on the second floor of the Empire State Building (the "Building"), and its landlord and related entities (together, "ESB") originally came before me as an appeal by Skyline from a Judgment entered by Bankruptcy Judge Stewart M. Bernstein.  On appeal, Skyline argued that the Bankruptcy Court lacked authority to enter the Judgment, and in any event had committed reversible errors on the merits.  Skyline argued that the Bankruptcy Court erred by awarding injunctive relief to ESB on its counterclaim

1

that Skyline had breached a provision of a 2005 lease amendment (the "May 2005 Agreement") which prohibited Skyline from paying commissions or sales incentives to Skyline employees or representatives working in "any area of or near the Building" (the "Protocol Provision").  And Skyline argued that the Bankruptcy Court erred by not holding that Article 42 of the lease (the "Electricity Provision"), requires ESB to bill Skyline based on a survey that estimates Skyline's actual consumption, not its estimated overall capacity to consume electricity.[1]

Without reaching the merits, I vacated the Judgement after determining that the Bankruptcy Court lacked authority to enter a final judgment over non-core matters to which the parties had not consented pursuant to section 157 of title 28 of the United States Code.[2]  In addition, I remanded for consideration of whether the Bankruptcy Court had authority to issue proposed findings of fact and conclusions of law under the circumstances of this proceeding. Over a year later, the Bankruptcy Court issued a decision on remand.

---

[1]    *See generally* Appellant New York Skyline, Inc.'s Memorandum of Law in Support of Appeal from Decisions and Orders of the Bankruptcy Court ("Skyline Mem."); Appellant New York Skyline, Inc.'s Reply Memorandum of Law in Support of Appeal from Decisions and Orders of the Bankruptcy Court ("Reply Mem.").

[2]    *See New York Skyline, Inc. v. Empire State Bldg. Trust Co. L.L.C. (In re New York Skyline, Inc.)*, 512 B.R. 159 (S.D.N.Y. 2014), *aff'd*, 601 Fed. App'x 52 (2015).

Pursuant to this District's Amended Standing Order of Reference, "[t]he district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution."[3]  Although it is troubling that an Article I judge would continue to preside over purely state-law contract claims long after their actual relevance to a bankruptcy case has terminated,[4] I am unaware of any case, controlling or otherwise, that has held that a bankruptcy court lacks

---

[3]      12 Misc. 00032 (January 31, 2012).

[4]      Because parties may be reluctant to question the propriety of a bankruptcy judge's continued retention of a case, it is incumbent upon the bankruptcy judge to do so.  This is a routine consideration for district courts.  *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988) (explaining that "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims") (citing *Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (stating that these factors usually will favor dismissing a case when "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought")).  To take but one of the factors, it is hard to imagine how judicial economy is served by a specialized Article I court performing a function that is at best at the very margin of its powers.  It does not help that this happens under a system that calls for de novo review by a district court.  That review must occur even if (in retrospect) the bankruptcy court should have dismissed the proceeding.  *See Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) (stating that "it is axiomatic that a court should decline to exercise jurisdiction over state-law claims when . . . federal claims [are dismissed] prior to trial").

3

authority under section 157 to issue proposed findings of fact and conclusions of law when jurisdiction is otherwise proper.  Accordingly, I will treat the Bankruptcy Court's Electricity Decision, Protocol Decision, and Stay Decision — as defined below — as proposed findings of fact and conclusions of law, and will treat the parties' appellate briefs as the objection, response, and reply, respectively, to the proposed findings of fact and conclusions of law.

For the following reasons, I accept the Bankruptcy Court's proposed findings of fact and conclusions of law with respect to the Electricity Provision and reject the Bankruptcy Court's interpretation of "near the Building," a term found in the Protocol Provision.

## II.    BACKGROUND

### A.    The Electricity Provision

Skyline's Twelfth Claim in its Third Amended Complaint alleged that ESB overcharged it for electricity in breach of the lease.[5]  Skyline sought declaratory and monetary relief.  A trial was held before the Bankruptcy Judge on September 24 and October 24, 2012.  Following trial, ESB moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).

---

[5]    *See New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C. (In re New York Skyline, Inc.)*, No. 09-1145, 2013 WL 655991 (Bankr. S.D.N.Y. Feb. 22, 2013) (the "Electricity Decision").

4

On February 22, 2013, the Bankruptcy Court issued the Electricity Decision, which granted ESB's motion and dismissed Skyline's claim.  As an initial matter, the Bankruptcy Court determined that Skyline failed to comply with the lease's contractual dispute resolution procedure and thus was precluded from disputing the methodology used by ESB in estimating Skyline's consumption of energy.[6]  Notably, Skyline has not objected to this determination.

The Bankruptcy Court found that Skyline did not prove that ESB's electrical consultant "failed to compute the connected load in accordance with the Lease or that ESB failed to correctly compute the electricity charges . . . ."[7]  The Bankruptcy Court determined that the Electricity Provision — and in particular the phrase "connected electrical load" — was not ambiguous and did not support Skyline's contention that the Electricity Rent Inclusion Factor was to be calculated based on Skyline's actual consumption of electricity.[8]

### B.     The Protocol Provision

ESB asserted a counterclaim based on Skyline's alleged violation of the Protocol Provision.  That provision states that "[a]ll [Skyline] employees and

---

[6]     *See id.* at *5.

[7]     *Id.*

[8]     *See id.*

representatives who work in the NYSR Premises or in any area of or near the

Building (including without limitation the [Second Floor Observatory] Visitor

Center) in the course of performing NYSR-related duties . . . [m]ust be salaried

employees and not working on commission or other sales incentive." A trial on the

counterclaim was held before the Bankruptcy Judge on May 6 and 7, 2013.[9]

Both sides agreed that the Protocol Provision was intended to stem

aggressive sales tactics by Skyline agents selling tickets to Skyline's helicopter

simulator attraction at or near the Building. They disagreed over whether Skyline

can consider an employee's sales performance in fixing his salary and whether

"any area of or near the Building" includes the sidewalks directly across the street

from the Building and west of the Building footprint but east of Sixth Avenue on

33rd and 34th Streets.

The Bankruptcy Court issued a decision (the "Protocol Decision") in

ESB's favor and granted an injunction barring Skyline from paying commissions

to Skyline representatives working in what was termed the "ESB Zone."[10] In

denying Skyline's request for a stay of the injunction pending appeal (the "Stay

Decision"), the Bankruptcy Court provided additional analysis of its interpretation

---

[9]      *See* Adv. Pro. Docket Nos. 98, 99.

[10]     *See New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C. (In re New York Skyline, Inc.)*, 497 B.R. 700 (Bankr. S.D.N.Y. 2013).

of the Protocol Provision.[11]

## III.   LEGAL STANDARD

The district court conducts a de novo review of those findings of fact and conclusions of law to which written objections have been made.[12]  "The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions."[13]

## IV.   APPLICABLE LAW

Under New York law, "[t]he court's function in interpreting a contract is to apply the meaning intended by the parties, as derived from the language of the contract in question."[14]  "[T]he best evidence of what parties to a written agreement

---

[11]      *See New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C. (In re New York Skyline, Inc.)*, No. 09-1145, 2013 WL 5487938 (Bankr. S.D.N.Y. Oct. 2, 2013).

[12]      *See* 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.  In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.").

[13]      Fed. R. Bankr. P. 9033(d).

[14]      *Marin v. Constitution Realty, LLC*, 11 N.Y.S.3d 550, 558–59 (1st Dep't 2015) (internal citations, quotations, and alterations omitted).

intend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[15]

"The question of whether a written contract is ambiguous is a question of law for the court."[16]  "Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."[17]  However, contract language is ambiguous if "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[18]  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing; evidence as to

---

[15]    *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal citations and quotations omitted).

[16]    *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

[17]    *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

[18]    *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

8

custom and usage is considered, as needed, to show what the parties' specialized language is fairly presumed to have meant."[19]

## V.   DISCUSSION

### A.   The Electricity Provision

As explained by the Bankruptcy Court:

> Article 42 of the Lease obligated Skyline to pay for electricity as additional rent. The amount of the additional rent, or Electrical Rent Inclusion Factor ("ERIF"), was initially set at $2.75 per rentable square foot, but a footnote to Article 42 stated that "the ERIF based on the survey initially made hereunder of Tenant's electricity consumption after it opens for business in the demised premises will be substantially higher than the $2.88 [the "Base ERIF"] being so paid prior to said survey."[20]

The Electricity Provision states that the ERIF

> has been partially based upon an estimate of the Lessee's connected electrical load, which shall be deemed to be the demand (KW), and hours of use thereof, which shall be deemed to be the energy (KWH), for ordinary lighting and light office equipment and the operation of the usual small business machines, including Xerox or other copying machines (such lighting and equipment are hereinafter called "Ordinary Equipment") during ordinary business hours ("ordinary business hours" shall be deemed to mean 50 hours per week), with Lessor providing an average connected load of 4[.5] watts of electricity for all purposes per rentable square foot.

In other words, "Skyline's Base ERIF was the product of the average connected

---

[19]     *Id.* at 466-67.

[20]     Electricity Decision, 2013 WL 655991, at *1.

load for ordinary equipment (4.5 watts per rentable square foot) multiplied by ordinary business hours (50 hours per week)."[21]

The parties agreed that the ERIF would increase if ESB's electrical consultant conducted a survey that revealed that Skyline was using equipment with a greater connected load. The Electricity Provision states:

> Lessor's electrical consultant may from time to time make surveys in the demised premises of the electrical equipment and fixtures and the use of the current. (i) If any such survey shall reflect a connected load in the demised premises in excess of 4 1/2 watts of electricity for all purposes per rentable square foot and/or energy usage in excess of ordinary business hours (each such excess is hereinafter called "excess electricity"), then the connected load and/or the hours of use portion(s) of the then existing ERIF shall be increased by an amount which is equal to a fraction of the then existing ERIF, the numerator of which is the excess electricity (i.e., excess connected load and/or excess usage) and the denominator of which is the connected load and/or the energy usage which was the basis for the computation of the then existing ERIF.

I accept the Bankruptcy Court's conclusion that the Electricity Provision is not ambiguous. It expressly requires Skyline's demand for electricity be measured by "connected load."[22] While "connected load" may be a "technical"

---

[21]     *Id.*

[22]     Skyline argues that this along with other terms in the Protocol Provision are technical, but this argument just confirms that it was appropriate for the Bankruptcy Court to hear testimony from experts on the meaning of the terms. *See Law Debenture Trust Co. of New York*, 595 F.3d at 466.

term, its meaning is not all that mysterious.  As Skyline admits, "connected load" means "demand."  In the context of electricity, "demand" is commonly understand to mean what a utility must have at the ready to power a light bulb, an appliance, or other equipment if it is used.[23]  This is evident to anyone who has ever run a business, because businesses are almost always charged based on demand.

Nonetheless Skyline implausibly argues that "since 'demand' is commonly defined as 'an urgent requirement, need or claim," a fair construction of Article 42 is that an ERIF tenant will be paying for electricity based on the electricity it needs over time."[24]  Skyline continues: "[i]f an electrical device is not in use, it does not need electricity.  Nothing in Article 42 unambiguously states that an ERIF tenant will be billed based on all of its electrical devices running at 100% during business hours."[25]  These arguments — which sound intentionally naive — are unpersuasive given the common understanding of demand in this context (not

---

[23]   Likewise, the ordinary, non-technical dictionary definition of "connected load" is "the total electric power-consuming rating of all devices (as lamps or motors) connected to a distribution system."  Merriam-Webster online dictionary.

[24]   Reply Mem. at 9 n.20 (quoting the American Heritage Dictionary (2d College Ed.)).

[25]   *Id.*

11

to mention the expert testimony offered at trial).[26]

Skyline also relies on the first footnote of the Electricity Provision, which states that "the ERIF based on the survey initially made hereunder of Tenant's electricity consumption after it opens for business in the demised premises will be substantially higher than the $2.88 being paid hereunder for the time of said survey."  Focusing on the term "consumption," Skyline argues that "additional rent for electricity charges must be based on ESB's estimate of actual usage determined by a survey instead of calculating Skyline's total maximum electrical capacity."[27]

However, that conclusion does not follow from the use of the term consumption in this footnote.  *First*, the term "connected load" does not conflict with the term "consumption" in Article 42.  The Electricity Provision expressly states that consumption has two components — connected load (defined as demand) and hours of use (energy).  *Second*, even if "electricity consumption" in the first footnote of the Electricity Provision meant that the initial survey would be

---

[26] Skyline's expert confirmed that "connected load" has only one definition, and is measured by viewing the nameplate information on the back of each piece of equipment.  Skyline's expert further testified that this is what ESB did in its surveys.  *See* Appellees' Memorandum of Law in Opposition to New York Skyline Inc's Appeal from Judgment of the Bankruptcy Court ("ESB Mem."), at 11 (citing record testimony).

[27] Skyline Mem. at 22.

based on Skyline's estimated actual consumption of electricity — and it is unlikely that it does — the second footnote in the Electricity Provision indicates that after the initial survey, the "ERIF will be adjusted in accordance with the provisions of this Article." These adjustments are based on consumption defined in terms of demand and energy — *i.e.*, consumption as the product of the connected load for the equipment used by Skyline and hours of use.[28]

Accordingly, I accept the Bankruptcy Court's conclusion that ESB did not breach the Electricity Provision. Under the lease, Skyline's demand for electricity is measured by connected load.[29] In addition, I accept the Bankruptcy Court's unchallenged finding that Skyline failed to comply with the lease's mandatory contractual dispute resolution procedure. This finding is itself a sufficient basis to dismiss Skyline's claim.

### B.   The Protocol Provision

The Bankruptcy Court found that the compensation and geographical

---

[28]   As noted by ESB, there is no dispute that Skyline does not and could not have a submeter in its premises. Thus, there is no way for ESB to measure Skyline's actual consumption of electricity.

[29]   I also reject Skyline's argument based on the principle of contra proferentum. "[A]bsent ambiguity, there [is] no reason to resort to *contra proferentum* to construe the [ ] agreement against the drafter . . . ." *Schron v. Troutman Sanders LLP*, 97 A.D.3d 87, 93 (1st Dep't 2012), *aff'd*, 20 N.Y.3d 430 (2013) (citing *Fernandez v. Price*, 63 A.D.3d 672, 676 (2d Dep't 2009) (explaining that contra proferentum is only used as a last resort).

limitation clauses in the Protocol Provision were ambiguous.  Skyline does not

dispute the findings of fact or conclusions of law concerning the compensation

terms.  In reaching the conclusion that the phrase "of or near the building" was

defined by the parameters of the "ESB Zone," the Bankruptcy Court explained

that:

> The most probative evidence of what the parties intended is evidenced by Skyline's understanding of the Zone as reflected in [Skyline's Chief Operating Officer Michael] Leeb's testimony and the independent contractor agreements signed prior to November 2010.  These agreements created a two block, one avenue frozen zone around the Building, bordered by 36th Street, 31st Street, Madison Avenue and Broadway, which was off limits to the independent contractors. Only salaried employees could sell tickets within that area. The limitation was a reasonable one and accomplished its purpose—preventing aggressive sales persons from accosting tenants and visitors "of or near the Building." In November 2010, Skyline narrowed the Zone to the Building's footprint, not because it had changed its view of the Zone but because it could not supervise employees selling tickets in the Zone.
>
> Accordingly, ESB is entitled to a declaration that all areas within the Zone, *i.e.*, south of 36th Street, north of 31st Street, west of Madison Avenue and east of Broadway, are areas "of or near the Building" within the meaning of the May 2005 Agreement, and Skyline breached the May 2005 Agreement by compensating its orange team of independent contractors selling within the Zone on a commission basis.  ESB lacks an adequate remedy at law for this continuing breach, and it is entitled to an injunction prohibiting Skyline from paying its employees or representatives that work in the Zone a commission or other sales incentive.[30]

---

[30]     Protocol Decision, 497 B.R. at 715-16.

The Bankruptcy Court found that Skyline breached the May 2005 Agreement by compensating its orange team of independent contractors selling within the Zone on a commission basis, but that it did not breach the May 2005 Agreement with respect to its employees.  The Bankruptcy Court entered an injunction barring Skyline from paying commissions to representatives within the ESB Zone.

### 1.      Skyline's Arguments for a Heightened Burden of Proof

Skyline argues that the Protocol Provision is a restrictive covenant and therefore ESB was required to prove the meaning of "of or near the building" by clear and convincing evidence, and any court interpreting the provision must apply the least restrictive interpretation.[31]  But what makes true restrictive covenants — which often take the form of negative easements — disfavored and subject to restrictive interpretation is that they limit a property owner's use of property or the property's alienability.[32]  Skyline has failed to cite any cases employing the clear

---

[31]      *See* Skyline Mem. at 16-17.

[32]      *See Witter v. Taggart*, 78 N.Y.2d 234, 237 (1991) ("Restrictive covenants are also commonly categorized as negative easements.  They restrain servient landowners from making otherwise lawful uses of their property. However, the law has long favored free and unencumbered use of real property, and covenants restricting use are strictly construed against those seeking to enforce them.  Courts will enforce restraints only where their existence has been established with clear and convincing proof by the dominant landowner.") (internal citations omitted).

and convincing standard to lease terms or to terms that do not relate to an owner's use of or ability to transfer real property.[33]

Skyline argues that the Bankruptcy Court implied conditions or restrictions not found in the contract.[34]  However, the Protocol Provision is an

---

[33]      *See Liebowitz v. Forman*, 22 A.D.3d 530, 531-32 (2d Dep't 2005) (restrictive covenant barring neighboring property owner from planting trees and shrubs which obstruct plaintiff's view of the Long Island Sound); *9394 LLC v. Farris*, 10 A.D.3d 708, 709 (2d Dep't 2004) (restrictive covenant barring neighboring property owner from using their properties for a business of any kind); *Kaufman v. Fass*, 302 A.D.2d 497, 498 (2d Dep't 2003) (same); *Petrello v. White*, 507 Fed. App'x 76, 78-79 (2d Cir. 2013) (explaining in context of covenant affecting the ownership of two parcels that, "where the meaning of a covenant remains ambiguous even in light of the extrinsic evidence, New York's rule of construction provides for adoption of the interpretation that is least restrictive of use and alienability of the property").

[34]      *See* Skyline Mem. at 17 (citing *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (construing stock warrants that did not address the contingency of a reverse stock split); *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978) (explaining that "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists.  Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole. This is especially so where, as here, the implied covenant sought to be recognized and enforced is of a type not favored by the courts."); *Raner v. Goldberg*, 244 N.Y. 438, 441 (1927) (explaining that "a person who makes an absolute promise to pay may not be excused from performance because of the happening of a contingency which destroys the value of the stipulated consideration for such payment where inference is reasonable that an express condition so providing would have been inserted in the contract had the parties so intended")).

*explicit* (if ambiguous) restriction on conduct and therefore rules of construction relating to *implied* conditions or restrictions — and Skyline's authority interpreting those rules — do not control.  Likewise, Skyline argues that where "contract provisions [ ] seek to restrain a company's or person's ability to freely ply its trade or use its property, New York courts, on public policy grounds, in a variety of factual settings and disputes, consistently construe such provisions strictly."[35] However, this is not such a case, and the authorities cited by Skyline — which concern implied restrictive covenants[36] and covenants not to compete[37] — are neither persuasive nor controlling.

### 2.    The Meaning of Near the Building

While Skyline is wrong about the nature of ESB's burden, there is

---

[35]       *Id.*

[36]       *See Peterson v. City of New York*, 235 A.D. 41, 43 (1st Dep't 1932) ("The deed to the city does not contain a negative covenant or restriction of any kind.  The agreement of the city to build and maintain a suitable dock on this property has been fully performed.  The courts are reluctant to infer that premises were not to be used for purposes other than those mentioned, unless the language of the covenant clearly indicates that intention."); *Johnson v. Colter*, 251 A.D. 697, 700 (4th Dep't 1937) ("An owner is ordinarily possessed of the right to the free and unrestricted use and enjoyment of his property; that right will not be curtailed unless such intent is clearly made to appear. Such a purpose is not manifest here.").

[37]       *See Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 273 (1963) (addressing whether restrictive covenant was enforceable "as either one ancillary to the sale of a business or one made in connection with a contract of employment").

no question that ESB had the burden of proof on this counterclaim. That burden

has not been met. ESB argued that the Protocol Provision applied to "any area

where tenants and visitors started to concentrate," which the Bankruptcy Court

properly rejected as unreasonable.[38]

However, in rejecting Skyline's argument for a narrow construction of

the Protocol Provision, the Bankruptcy Court placed too much weight on the post-

litigation agreements Skyline entered into with independent contractors in

November 2009. There is nothing in the record that suggests that the ESB Zone

described in those agreements was what the parties intended the meaning of "near

the Building" to be in 2005.

When used as a preposition, as it is in the Protocol Division, "near"

generally means "close to."[39] Furthermore, the parties agreed that the Protocol

Provision was intended to stem aggressive sales tactics by Skyline agents selling

tickets to Skyline's helicopter simulator attraction at or near the Building, but

especially in front of the Building and on the sidewalk footprint.[40] And "[t]he

---

[38]    Protocol Decision, 497 B.R. at 716.

[39]    *See* Black's Law Dictionary 1129 (9th ed. 2009) ("[c]lose to; not far
away, as a measure of distance"); Webster's Third New International Dictionary
Unabridged 1510 (1981) ("not far distant in time, place, or degree").

[40]    *See* Protocol Decision, 497 B.R. at 713.

parties understood that a commission salesperson who received compensation based on the number of tickets he sold was more likely to engage in the type of aggressive behavior ESB sought to forestall."[41]

Apart from the language of the Protocol Provision and what the parties agreed on, the next best evidence of what the parties intended is their conduct immediately following the May 2005 Agreement.  This evidence cuts against imposition of the ESB Zone.  As explained by the Bankruptcy Court,

> Following the May 2005 Agreement, Skyline established a system using two different types of sales agents on the street: the blue jackets and the orange jackets. (Tr. at 288:10–15.) The blue jackets, or blue team, were employees of Skyline who sold tickets on the footprint. (Tr. at 288:16–21, 289:6–19, 304:9–16.) The orange jackets, or orange team, were independent contractors of Skyline who sold tickets on all areas outside of the footprint of the Building. (Tr. at 288:16–21, 289:6–15.) Skyline admitted that it compensated the independent contractors on a commission basis.[42]

By its terms, section 7(d) of the May 2005 Agreement prohibits independent contractors from working near the Building, because anyone working near the building "[m]ust be [a] salaried employee[]."  It is reasonable to infer from ESB's failure to protest Skyline's practices that it did not view those practices as violating the Protocol Provision.  Likewise, ESB concedes that in May 2008, Leeb told

---

[41]     *Id.* at 715.

[42]     *Id.* at 714.

ESB's Jean-Yves Ghazi that Skyline used independent contractors within the ESB Zone.[43]  Skyline filed for bankruptcy protection in January 2009.  Again, it is reasonable to infer that if Skyline's conduct had been objectionable within the understanding of the parties, ESB would have pursued its rights in the eight months prior to Skyline's bankruptcy filing.

Because the November 2009 independent contractor agreements were entered into after this litigation began (and were in effect for a short duration), they are not entitled to greater weight than the immediate and long-term conduct of the parties following the May 2005 Agreement and prior to the commencement of litigation.[44]  Similarly, the fact that Leeb's view of the ESB Zone in 2009 and 2010 shifted is of little relevance to the parties' intent in 2005.

The Bankruptcy Court also relied on the third bullet point of section 7(d).  That provision prohibits any Skyline employee or representative from engaging in any Skyline business in the "immediate area . . . directly in front of any Building entrance" (the "Entrance Provision").  The Bankruptcy Court stated

---

[43]     *See* ESB Mem. at 20.

[44]     *See IBJ Shroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("Generally speaking, the practical interpretation of a contract by parties to it for any considerable period of time *before it comes to be the subject of controversy* is deemed of great, if not controlling, influence.") (emphasis added).

that because the Entrance Provision "already prevented aggressive sales tactics in front of the Building entrances, [ ] the geographic limitation on independent contractors plainly envisioned a broader area at a distance from the Building."[45] However, there is no reason to draw such an inference in favor of ESB. The Entrance Provision bans a far broader set of conduct than just ticket sales. Furthermore, the Protocol Provision does not necessarily *extend* geographic boundaries as it unambiguously prohibits independent contractors from working *inside* the Building.

Finally, I credit Skyline's argument that the provision requiring Skyline representatives to wear a uniform approved by ESB to avoid confusion between ESB staff and Skyline's employees and to present a "professional appearance" makes little sense if "near the Building" includes the "ESB Zone."[46] For all these reasons, ESB has not proven that "near to" extends beyond the sidewalks adjacent to the Building where the "blue jackets" worked. Accordingly, ESB is not entitled to an injunction that bars the payment of commissions beyond the Building footprint.

---

[45]    Stay Decision, 2013 WL 5487938, at *5.

[46]    Skyline Mem. at 19.

## VI. CONCLUSION

For the foregoing reasons, I accept the Bankruptcy Court's proposed findings of fact and conclusions of law with respect to the Electricity Provision and reject the Bankruptcy Court's interpretation of "near the Building" in the Protocol Provision. If it has not already done so, the Bankruptcy Court is directed to enter the proposed order and final judgment dismissing Skyline's Third Claim submitted by ESB on August 31, 2015; thereafter, the reference of this adversary proceeding shall be withdrawn from the Bankruptcy Court. The parties are directed to submit to this Court an agreed upon judgment addressing all claims in this adversary proceeding other than Skyline's Third Claim.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
          October 20, 2015

22

**- Appearances -**

**For New York Skyline, Inc.**

James Wilson Perkins, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
(212) 801-3188

Charles Addison Stewart, III, Esq.
Stewart Occhipinti, LLP
One Exchange Plaza
55 Broadway
Suite 1501
New York, NY 10006
(212) 239-5500

**For Empire State Building
Company L.L.C., Empire State
Building, Inc., and Empire State
Building Associates L.L.C.:**

David Scott Tannenbaum, Esq.
Stern, Tannenbaum & Bell, L.L.P.
380 Lexington Avenue
Suite 3600
New York, NY 10168
(212) 792-8484